No. 105,603

STATE OF KANSAS, *Appellee*, v. MONH SUADY, *Appellant*.

(327 P.3d 466)

Opinion filed June 27, 2014.

*Lydia Krebs*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: The Court of Appeals, in an unpublished opinion filed December 21, 2012, reversed Monh Suady's conviction of aggravated robbery, holding that the brief taking of the victim's vehicle was merely ancillary to other crimes. The Court of Appeals affirmed his convictions of attempted aggravated robbery and intentional aggravated battery. This court denied Suady's petition for review and granted the State's cross-petition for review, with the result that the only issue before this court is the reversed aggravated robbery conviction.

In August 2009, Kenneth Price, who was about 60 years old, single, and a resident of Emporia, became acquainted through an online dating service with a woman named Anna Marie Harris, who represented herself as being approximately the same age as Price, single, and living in the Kansas City area. Price found her online profile interesting enough to initiate an online conversation with her.

After several telephone conversations, the two decided to meet in person. Harris gave Price the directions to her apartment, and they agreed to get together on the afternoon of August 26. Price left Emporia around noon driving his 2004 Durango SUV and arrived at Harris' apartment around 2 p.m. He then drove them to a restaurant. On their way, Harris spent considerable time talking and texting with someone on her cell phone. Immediately upon arriving at the restaurant, Harris announced that she had to use the restroom and then disappeared for 15 to 20 minutes. The couple left the restaurant around 3 p.m., and Price drove her back to her apartment. The two agreed that they would meet again later that day.

Price then drove to a nearby WalMart and purchased a DVD. While he was in the store, his vehicle was locked. After returning to his vehicle, Price drove to a far side of the parking lot and read a magazine while he passed time until he would see Harris again.

Around 6 p.m., Harris arrived at the parking lot. She pulled up next to Price's SUV, smiled, and waved to him to come over to her car. He got in the front passenger seat of her car, where he sat talking with her for 10 to 15 minutes. Price had $200-$300 with him, and he gave Harris some money to assist her with some traveling expenses and to pay a bill.

The two discussed getting together again, and then Price got out of Harris' car and returned to his own vehicle. After watching Harris drive away, he started his return trip to Emporia. Surveillance cameras operated by WalMart would later reveal that a dark figure approached Price's SUV while he was waiting for Harris and quickly moved up near the SUV as soon as Price got out of his vehicle. The recorded images did not show the dark figure leave the area near the SUV, and the dark figure was no longer visible when Price drove away.

As he was driving along Interstate 35, Price was approaching a construction area when he experienced a hand come around his neck from behind and another hand holding a knife to his throat while a man's voice began screaming in his ear. Price grabbed at the knife to push it away, slammed on the brakes, and began jerking the steering wheel back and forth rapidly. He heard the man shout,

"Don't do that, stop!" and, "Give me your money!" Price continued to drive erratically in order to alert people around him that he was in trouble and to keep his assailant off balance. He continued to keep a grip on the knife. He then slammed hard on the brakes, reached across with his right hand to open the door, and used his shoulder and foot to push the door open. Although the SUV was traveling at 10-15 miles per hour, Price jumped out, releasing his hold on the knife and injuring his shoulder as it hit the door frame.

The SUV continued forward until it hit a barrier, coming to a stop about 40-50 feet from where Price landed. As Price stood on the highway next to the median, he saw the brake lights on his SUV come on and, shortly afterwards, he saw the backup lights come on. The SUV then backed across the highway to the shoulder and backed down the shoulder to where Price was standing.

The assailant got out of the SUV and shut the door, and the SUV continued to roll in reverse down the highway and across three lanes of traffic. The assailant screamed, "Give me your money! Give me your money!" Price stepped into oncoming traffic to get away from the assailant, while the assailant grabbed at his arms and his pockets. This all happened only a few seconds after Price had jumped out of his vehicle.

During the attack, Price was able to get a good look at his assailant, whom he later identified as Suady. After about 30 seconds, Suady stopped trying to find Price's money and ran away up an embankment toward a motel. Price ran after his SUV, trying to catch it before it hit the highway barrier, but was unable to reach it in time. When he arrived at the SUV, he reached inside, turned off the motor, retrieved his cell phone, called 911, and waited for police to arrive. He suffered permanent injuries to the nerves in his left hand from the knife and lasting injuries to his shoulder from where it hit the door frame.

Investigators contacted Harris and developed a lead that Suady was a suspect in the attack. Subsequent investigations disclosed that Harris and Suady had made approximately 25 telephone calls to each other on the day of the attack, including a call that Suady made almost immediately after the incident from a location very near the scene.

The State charged Suady with one count of aggravated robbery based on his taking of the Durango SUV, one count of aggravated battery, and one count of attempted aggravated robbery based on the attempted taking of Price's money. At the conclusion of the State's case, Suady moved to dismiss the aggravated robbery charge, asserting that the State failed to prove that he had taken Price's SUV from the scene and that there was no evidence that he intended to take the SUV from Price. The district court overruled the objection, and the jury found Suady guilty of all three charges.

The district court sentenced Suady to a term of 247 months' imprisonment for the aggravated robbery, a consecutive term of 43 months' imprisonment for the aggravated battery, and a concurrent term of 32 months' imprisonment for the attempted aggravated robbery. Suady filed a timely notice of appeal. The Court of Appeals reversed the aggravated robbery conviction but affirmed the remaining convictions and sentences. Both Suady and the State filed petitions for review. This court denied Suady's petition for review and granted the State's cross-petition, which was limited to the aggravated robbery reversal.

The Court of Appeals reversed the aggravated robbery conviction, relying on *State v. Montgomery*, 26 Kan. App. 2d 346, 349-50, 988 P.2d 258 (1999). The panel quoted *Montgomery* for the proposition that aggravated robbery is a specific intent crime and that a taking incidental to the perpetration of another crime does not satisfy the statutory element of a coercive taking. The panel concluded that Suady never formed the specific intent to take Price's Durango and that his use of the SUV to drive to where Price was standing was only incidental to his failed attempt to rob Price of his money.

In *State v. Edwards*, 299 Kan. 1008, 327 P.3d 469 (2014) we expressly disapproved of the *Montgomery* analysis. We noted that the plain language of the robbery statutes creates no requirement of specific intent and requires only a "taking" of property, without distinguishing between "incidental" and intentional taking. In light of *Edwards*, we reverse the Court of Appeals on the issue before us.

Because the Court of Appeals reversed on the *Montgomery* issue, it did not address other challenges to the aggravated robbery conviction. The first of those issues is whether the statutory language of taking property "from the person or presence of another" creates an alternative means issue, both for the robbery and for the attempted robbery convictions. This court has ruled against Suady's position in *State v. Littlejohn*, 298 Kan. 632, 658, 316 P.3d 136 (2014).

Suady also argued that his convictions for aggravated robbery and attempted aggravated robbery were multiplicitous. The Court of Appeals declined to address this issue, determining that it was moot because it had already reversed the aggravated robbery conviction. *Suady*, 2012 WL 6734503, at *3. This issue is no longer moot, but it lies outside the narrow scope for which review was granted. The case is accordingly remanded to the Court of Appeals for resolution. Because review was not granted on the other issues raised by Suady, the judgment of the Court of Appeals with respect to those issues is affirmed.

MORITZ, J., not participating.

R. SCOTT MCQUIN, District Judge, assigned.

\* \* \*

JOHNSON, J., dissenting: I disagree with the majority's apparent belief that the disapproval of *State v. Montgomery*, 26 Kan. App. 2d 346, 349-50, 988 P.2d 258 (1999), in *State v. Edwards*, 299 Kan. 1008, 327 P.3d 469 (2014), automatically validates Suady's conviction for aggravated robbery of the victim's vehicle.

I do not quibble with *Edwards'* holding that *Montgomery* should not have grafted theft's specific intent onto the crime of robbery. Obviously, the plain language of the robbery definition in K.S.A. 21-3426—"the taking of property from the person or presence of

another by force or by threat of bodily harm to any person"—does not suggest that it is a specific intent crime. Moreover, as Justice Beier explained in her dissent in *State v. Pennington*, 281 Kan. 426, 443, 132 P.3d 902 (2006) (Beier, J., dissenting):

"Because the definitional statutes for aggravated robbery and robbery are silent on the *mens rea* element, the crime of aggravated robbery requires proof only of general intent, as it is described in K.S.A. 21-3201(a) and (b):

'(a) Except as otherwise provided, a criminal intent is an essential element of every crime defined by this code. Criminal intent may be established by proof that the conduct of the accused person was intentional or reckless. Proof of intentional conduct shall be required to establish criminal intent, unless the statute defining the crime expressly provides that the prohibited act is criminal if done in a reckless manner.

'(b) Intentional conduct is conduct that is purposeful and willful and not accidental. As used in this code, the terms "knowing," "willful," "purposeful," and "on purpose" are included within the term "intentional." ' "

Because the applicable definitional statutes do not proscribe unintentional or reckless robbery, intentional conduct is required to meet the essential *mens rea* element of aggravated robbery. The majority in *Pennington* described the requisite *mens rea* as follows: "Aggravated robbery requires an intent to take property." 281 Kan. at 434.

Here, the evidence clearly indicated that Suady had the intent to take money from the victim and that criminal intent resulted in a conviction for attempted aggravated robbery. But there is no evidence to support the notion that Suady had the intent to take the victim's vehicle. To the contrary, the victim exited the moving vehicle, leaving Suady in the backseat, unable to control the vehicle. I would not say that the backseat passenger in a driverless, runaway vehicle either possessed the criminal intent to "take" the vehicle from the person who bailed out of the driver's seat or effected a taking of that vehicle. Then, after the vehicle stopped on its own, allowing Suady to take control of the vehicle, he accomplished that task by simply moving from the backseat to the driver's seat, *i.e.*, no force or threat of bodily harm was used to "take" the vehicle. Moreover, after Suady took control of the vehicle, he drove it back to its owner, contradicting any inference that he had the criminal intent to take the vehicle.

In sum, I would affirm the Court of Appeals' reversal of the aggravated robbery conviction as being the correct decision because the facts simply do not support the charged crime, regardless of *Edwards'* dictum disapproving of *Montgomery*.

LUCKERT, J. and MCQUIN, J., join in the foregoing dissent.